## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| **ESTATE OF ROSA BONILLA, BY AND THROUGH HER AUTHORIZED REPRESENTATIVE ZOEY BONILLA, ZOEY BONILLA, INDIVIDUALLY, J.B., MINOR and A.B., MINOR,** | § § § § § § | **CIVIL ACTION NO. 1:18-cv-00104 JURY TRIAL DEMANDED** |
| *Plaintiffs,* | § § | |
| **v.** | § § | |
| **ORANGE COUNTY, TEXAS,** *et al.*, | § § | |
| *Defendants.* | § | |

### COUNTY DEFENDANTS' FIRST AMENDED
### <u>MOTION FOR SUMMARY JUDGMENT</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

Pursuant to Federal Rule of Civil Procedure 56, Defendants ORANGE COUNTY, TEXAS, TIFFANI DICKERSON, and JENIFER SHAFER, (collectively, the "County Defendants"), file this First Amended Motion for Summary Judgment and respectfully request the Court find that the claims of Plaintiff Zoey Bonilla ("Zoey Bonilla"), Plaintiff Justus Bonilla ("Justus Bonilla), and Plaintiff A.B. (a minor) ("A.B.") (collectively, "Plaintiffs") against them fail as a matter of law and grant summary judgment in their favor.

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS...............................................................................................ii

TABLE OF AUTHORITIES ........................................................................................iv

INDEX OF SUMMARY JUDGMENT EVIDENCE ...........................................................vii

I.  NATURE & STAGE OF PROCEEDINGS ...............................................................1

II.  SUMMARY OF ARGUMENT ...............................................................................2

III.  STATEMENT OF ISSUES ...................................................................................4

IV.  STATEMENT OF UNDISPUTED MATERIAL FACTS ...............................................5

    A.  Bonilla's Background..............................................................................5

    B.  Bonilla's Arrest and Incarceration in the Orange County Jail ...............5

    C.  Bonilla's Suicide ....................................................................................9

    D.  The Texas Commission on Jail Standards' Investigation Found No Violations...10

    E.  All OCSO Corrections Officers and LVNs are Trained and Certified by the Texas Commission on Law Enforcement ...........................................11

    F.  OCSO Policies........................................................................................12

V.  ARGUMENTS & AUTHORITIES .......................................................................14

    A.  Summary Judgment is Proper Because There are No Genuine Issues of Material Fact...........................................................................................14

    B.  Plaintiffs Have Not Adequately Pled a Fourteenth Amendment Condition of Confinement Claim.............................................................................15

    C.  Plaintiffs' Fourteenth Amendment Episodic Act or Omission Claims Against Officer Shafer and LVN Dickerson Fail as a Matter of Law Because They Were Not Deliberately Indifferent to Any Known, Substantial Risk of Suicide ...................................................................................................17

        1.  Neither Officer Shafer nor LVN Dickerson had subjective knowledge of substantial risk of suicide. ...................................18

            a.  Officer Shafer did not believe Bonilla would harm herself. .........18

|  |  | b. | LVN Dickerson did not believe Bonilla would harm herself......... 20 |

|  | 2. | Neither Officer Shafer nor LVN Dickerson Lewis acted with deliberate indifference. ...................................................................... 22 |

|  |  | a. | Officer Shafer did not act with deliberate indifference towards Bonilla............................................................................ 22 |

|  |  | b. | LVN Dickerson did not act with deliberate indifference towards Bonilla............................................................................ 23 |

| D. | Plaintiffs' Fourteenth Amendment Claims Against Officer Shafer and LVN Dickerson Also Fail Because They Are Entitled to Qualified Immunity.............. 24 |

|  | 1. | Officer Shafer and LVN Dickerson did not violate any clearly established law. .................................................................................. 24 |

|  | 2. | Even if there was a violation of clearly established law (which there was not), Officer Shafer and LVN Dickerson acted objectively reasonable. ................................................................................................. 26 |

| E. | Plaintiffs' Claims Against the County Fail Because There Is No Evidence of an Official Policy or Custom That Was the "Moving Force" Behind Any Alleged Constitutional Violation or Failure to Train ............................................ 29 |

|  | 1. | There is no official policy or custom that was the "moving force" behind any alleged constitutional violation................................................ 29 |

|  | 2. | The Orange County Jail personnel are properly trained and licensed....... 34 |

| VI. | Prayer ....................................................................................................................... 35 |

# TABLE OF AUTHORITIES

<u>CASES</u>

*Anderson v. Creighton,* 483 U.S. 635 (1987) ...............................................................27

*Anderson v. Dallas Cty. Tex.*, 286 F. App'x 850 (5th Cir. 2008) ...............................16

*Bd. of the Cty. Comm'rs of Bryan Cty., Okla. v. Brown,* 520 U.S. 397 (1997) ...............29

*Belcher v. Oliver,* 898 F.2d 32 (4th Cir. 1990) ...............................................................26

*Branton v. City of Moss Point*, 261 F. App'x 659 (5th Cir. 2008)...............................18

*Brumfield v. Hollins*, 551 F.3d 322 (5th Cir. 2008) ......................................................22

*Burns v. Galveston,* 905 F.2d 100 (5th Cir. 1990) ........................................................26

*Calton v. Livingston,* No. H–09–2507, 2011 WL 2118700 (S.D. Tex. May 27, 2011) ...22, 26, 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...............................................................14

*Comstock v. McCrary,* 273 F.3d 693 (6th Cir. 2001)....................................................26

*Connick v. Thompson*, 131 S.Ct. 1350 (2011) ...............................................................34

*Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752 (5th Cir. 2001).............. 18, 22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992).........................14

*Estate of Davis ex. Rel. McCully v. City of N. Richland Hills*,
    406 F.3d 375 (5th Cir. 2005) .................................................................. 34, 35

*Farmer v. Brennan,* 511 U.S. 825 (1994) ......................................................................17

*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004)..............................................24

*Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736 (5th Cir. 1997) .......................... 15, 16

*Forsyth v. Barr*, 19 F.3d 1527 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994) ..............15

*Fountain v. City of Plano Police Dep't*, No. 4:12-cv-26,
    2012 WL 7149510 (E.D. Tex. Dec. 13, 2012) ................................................24

*Freeman v. Gore,* 483 F.3d 404 (5th Cir. 2007) ...........................................................27

*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996).......................................... 15, 17, 22

*Jacobs v. West Feliciana Sheriff's Dep't,* 228 F.3d 388 (5th Cir. 2000) ................................ 17, 26

*Jones v. Throckmorton Cty., Tex.,* No. 1:02–CV–182–C,
  2004 WL 419811 (N.D. Tex. March 8, 2004) ................................................................ 17

*Lampkin v. City of Nacogdoches*, 7 F.3d 430 (5th Cir. 1993) ...................................... 27

*Leonard v. Dixie Well Serv. & Supply, Inc*., 828 F.2d 291 (5th Cir. 1987) ................................ 14

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ...................................................... 15

*Lytle v. Bexar Cty., Tex.,* 560 F.3d 404 (5th Cir. 2009) .......................................... 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................... 15

*Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978) ...................... 2, 29, 34

*Montano v. Orange Cty.*, 842 F.3d 865 (5th Cir. 2016) ........................................... 16, 33

*Nunez v. Deviney,* No. 4:06–CV–0579–BE, 2007 WL 2059726
  (N.D. Tex. July 17, 2007) .................................................................................. 17

*Olabisiomotosho v. City of Houston*, 185 F.3d 521 (5th Cir. 1999)  ...................... 15, 16

*Peterson v. City of Fort Worth, Tex.,* 588 F.3d. 838 (5th Cir. 2002) ........................... 29

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001)  ................................ 30

*Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997)  ..................................................... 15, 16

*Smith v. Brenoetty*, 158 F.3d 908 (5th Cir. 1998) ..................................................... 14

*Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999) ..................................................... 14

*Taylor v. Barkes*, --- U.S. ---, 135 S.Ct. 2042 (Jun. 1, 2015)  ................................ 25, 26

*Thompson v. Upshur Cty., Tex.,* 245 F.3d 447 (5th Cir. 2001) ................................ 17, 27

*Tittle v. Jefferson Cty. Comm'n,* 10 F.3d 1535 (11th Cir. 1994) ............................. 26

*Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir. 1992) ................................................ 15

*Wallace v. Cty. of Comal*, 400 F.3d 284 (5th Cir. 2005) ......................................... 24

*Whitt v. Stephens Cty.*, 236 F. App'x 900 (5th Cir. 2007) ....................................... 18, 28

*Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir. 1999) ............................................................... 27

STATUTES AND RULES

FED. R. CIV. P. 56 ........................................................................................................... 2, 14

37 TEX. ADMIN. CODE § 273.5 .......................................................................................... 18, 23

37 TEX. ADMIN. CODE §§ 273–275 ......................................................................................... 21

37 TEX. ADMIN. CODE § 275.1 .................................................................................... 7, 20, 23, 32

TEX. CODE CRIM. PROC. art. 16.22 ....................................................................................... 8, 18, 23

42 U.S.C. § 1983 ............................................................................................................ 2, 27

SECONDARY SOURCES

TEXAS COMMISSION ON JAIL STANDARDS (last visited May 13, 2019) ......................................... 19

## INDEX OF SUMMARY JUDGMENT EVIDENCE

In support of this Motion, the County Defendants rely on, and incorporate by reference as if set forth at length herein, the following evidence:

| | | |
|---|---|---|
| Exhibit A | — | Highlighted Excerpt of Zoey Bonilla's Deposition Transcript |
| Exhibit B | — | Orange Police Department Incident Report |
| Exhibit C | — | Orange County Sheriff's Office Booking Sheet for Bonilla |
| Exhibit D | — | Intake Questionnaire |
| Exhibit E | — | Screening Form for Suicide and Medical/Mental/Developmental Impairments |
| Exhibit F | — | Highlighted Excerpt of Jenifer Shafer's Deposition Transcript |
| Exhibit G | — | Highlighted Excerpt of Madeline Lewis' Deposition Transcript |
| Exhibit H | — | Jail Observation Logs |
| Exhibit I | — | Statement of Crystal Yocham |
| Exhibit J | — | Highlighted Excerpt of Tiffani Dickerson's Deposition Transcript |
| Exhibit K | — | Magistrate and MHMR Notification |
| Exhibit L | — | Statements of Madeline Lewis |
| Exhibit M | — | Highlighted Excerpt of William Jowers' Deposition Transcript |
| Exhibit N | — | Jail Video |
| Exhibit O | — | Letter from Texas Commission on Jail Standards |
| Exhibit P | — | Autopsy and Toxicology Reports |
| Exhibit Q | — | Highlighted Excerpt of Keith Merritt's Deposition Transcript |
| Exhibit R | — | Highlighted Excerpt of Justus Bonilla's Deposition Transcript |
| Exhibit S | — | Jenifer Shafer's TCOLE Personal Status Report |
| Exhibit T | — | Tiffani Dickerson's TCOLE Personal Status Report |
| Exhibit U | — | Highlighted Excerpt of OCSO Correctional Facility Operations Plan, effective April 8, 2015 |
| Exhibit V | — | Infirmary Doctor Protocol |
| Exhibit W | — | Staff Training Agenda, dated February 2, 2017 |

## I.   NATURE & STAGE OF PROCEEDINGS

This matter arises from the suicide of Rosa Bonilla ("Bonilla") during her incarceration in the Orange County Jail.  Plaintiffs are Bonilla's surviving mother and two (2) children.  Originally, there were nine (9) named Defendants, unnamed Defendants, and multiple causes of action under federal and state law.  The Parties have filed numerous motions which ultimately narrowed the number of Defendants and claims.

After this matter was removed from state court, Plaintiffs filed their First Amended Complaint on October 1, 2018.[1]  The County Defendants filed a Partial Motion to Dismiss certain claims therein.[2]  In response, Plaintiffs filed an opposed Motion for Leave to file a Second Amended Complaint.[3]  Later, on January 25, 2019, Plaintiffs filed a motion to voluntary dismiss several of the named Defendants, which was granted by the Court that same day.[4]

On May 20, 2019, the County Defendants filed their original Motion for Summary Judgment as to Plaintiffs' First Amended Complaint.[5]  Plaintiffs filed a Response in which they voluntarily dismissed Defendant Madeline Lewis and their claims under the Americans with Disabilities Act and the Rehabilitation Act.[6]

On July 8, 2019, the Court entered a Memorandum and Order, which granted the County Defendants' Partial Motion to Dismiss and Plaintiffs' Motion for Leave to file a Second Amended Complaint.[7]  As a result of the Court's Order, Defendant Sheriff Keith Merritt ("Sheriff Merritt") and Plaintiffs' Eighth Amendment claim were dismissed.[8]

Now, the remaining defendants are Orange County (the "County") and Individual

---

[1] Dkt. No. 14.
[2] Dkt. No. 17.
[3] Dkt. No. 23.
[4] Demetrio Gonzales, William Jowers, and Phillip Thompson were dismissed as Defendants.  *See* Dkt. Nos. 29–30.
[5] Dkt. No. 35.
[6] Resp., Dkt. No. 39, ¶¶ 97, 112.
[7] Dkt. No. 41.
[8] *Id.*

Defendants Corrections Officer Jenifer Shafer ("Officer Shafer") and Licensed Vocational Nurse Tiffani Dickerson ("LVN Dickerson"). Plaintiffs' remaining federal causes of action, pursuant to 42 U.S.C. § 1983 ("Section 1983"), are: (1) Fourteenth Amendment condition of confinement claim; (2) Fourteenth Amendment episodic act or omission claim; (3) *Monell* liability against the County;[9] and (4) failure to train claim against the County. Pursuant to this Court's most recent Scheduling Order,[10] the County Defendants now timely file this First Amended Motion for Summary Judgment as to Plaintiffs' Second Amended Complaint.[11]

## II.   SUMMARY OF ARGUMENT

All of Plaintiffs' claims against the County Defendants fail as a matter of law and summary judgment is appropriate pursuant to Federal Rule of Civil Procedure 56. There has been extensive written and deposition discovery conducted in this matter, and the record overwhelmingly reveals that none of the County Defendants violated Bonilla's constitutional rights.

Bonilla was arrested and booked into the Orange County Jail for the illegal possession of a controlled substance, specifically Xanax. Bonilla was calm and positive throughout the booking process. Officer Shafer performed the initial intake screening, and Bonilla reported that she was bipolar and taking three (3) medications, including Xanax. She also reported she had a history of abusing Xanax and marijuana. Despite her arrest charge and drug abuse history, neither the arresting officer nor Officer Shafer believed Bonilla showed signs of intoxication. During the screening, Bonilla denied that she would experience any withdrawal symptoms and also reported that she did not intend to harm herself, was not suicidal, and had never attempted suicide in the past. After the screening, Officer Shafer continued to observe Bonilla for about an hour. Based

---

[9] *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978).
[10] Dkt. No. 36.
[11] Dkt. No. 25.

on the screening and Officer Shafer's observations of and interactions with Bonilla, Bonilla was not identified as a candidate for suicide watch.  Officer Shafer placed Bonilla in a female holding cell until she could be classified.  At the time, no other female inmates were awaiting classification, so Bonilla was in the holding cell alone.

Pursuant to policy, and in excess of state requirements, Bonilla was observed every thirty (30) minutes by corrections officers.  At no time did any of the Individual Defendants or any other corrections officers believe that Bonilla exhibited signs of suicidal tendencies or otherwise was at risk for self-harm.  To the contrary, several times throughout her incarceration, Bonilla expressed that she would bond out the next day.

Bonilla had been incarcerated in the Orange County Jail for about ten (10) hours when Corrections Officer Madeline Lewis ("Officer Lewis") discovered that she attempted suicide by hanging herself with a sheet tied to the phone conduit in the cell.  Jail video confirms that Officer Lewis immediately radioed for assistance.  Additional corrections officers were in Bonilla's cell and began life-saving measures within twenty-nine (29) seconds.  They performed chest compressions until emergency medical services arrived—within seven (7) minutes from when Bonilla was first discovered.  They obtained a pulse, and Bonilla was taken to the hospital.  Despite everyone's efforts, Bonilla was declared brain dead two (2) days later.

Based on Bonilla's death, Plaintiffs allege that:

1.      the County Defendants failed to provide constitutionally adequate conditions of confinement;

2.      the Individual Defendants were deliberately indifferent to Bonilla's substantial risk of suicide by failing to prevent her death—specifically, by allegedly failing to provide an adequate medical screening, failing to provide medication (specifically, Xanax), failing to adequately monitor, and failing to provide suicide-prevention bedding;

3.      the County had policies, practices, or customs that were the "moving force" behind the alleged violation of Bonilla's constitutional rights; and

- 3 -

4.      the County failed to train jail personnel with respect to mental health issues and suicide prevention.

As set forth fully below, all of Plaintiffs' claims are meritless and fail as a matter of law in light of the established record.  First, Plaintiffs' Fourteenth Amendment condition of confinement claim fails because the actual harm of which Plaintiffs complain is the alleged omissions of the Individual Defendants, not the general conditions, practices, rules, or restrictions of the Orange County Jail.  Second, Plaintiffs' Fourteenth Amendment episodic act or omission claims fail because Officer Shafer and LVN Dickerson did not have subjective knowledge of and were not deliberately indifferent to any substantial risk that Bonilla may commit suicide.  Further, they are entitled to qualified immunity because their actions did not violate clearly established law and their actions were objectively reasonable.  Lastly, the County has demonstrated that it has adopted and implemented adequate policies to address mental health issues and suicide prevention and train jail personnel regarding the same, and none of its policies, practices, or customs resulted in any violation of Bonilla's constitutional rights.  Bonilla's death is tragic, but, ultimately, the decision to commit suicide was hers alone.  Because Plaintiffs cannot raise a genuine issue of material fact on any of their claims, summary judgment is appropriate.

### III.    STATEMENT OF ISSUES

1.      Whether Plaintiffs have adequately pled a condition of confinement claim.

2.      Whether Officer Shafer and LVN Dickerson violated Bonilla's constitutional rights by being deliberately indifferent to a known, substantial risk of suicide.

3.      Whether Officer Shafer and LVN Dickerson are entitled to qualified immunity.

4.      To the extent any Individual Defendant violated Bonilla's constitutional rights, whether the County had a policy, practice, or custom that was the "moving force" behind any such violation.

5.      Whether the County failed to train the Individual Defendants.

#### IV.   STATEMENT OF UNDISPUTED MATERIAL FACTS

The County Defendants contend that the following material facts are undisputed and are supported by evidence produced during discovery and/or deposition testimony.

**A.   Bonilla's Background**

1.   At the time of her death, Decedent Rosa Bonilla ("Bonilla") was thirty-five (35) year old.[12]  She was the only child of Zoey Bonilla and Roy Ward (now deceased).[13]

2.   Bonilla never married, but she had two (2) children, Justus Bonilla (twenty (20) years old) and minor A.B. (seventeen (17) years old).[14]  For most (if not all) of their lives, Justus Bonilla and A.B. lived with their grandmother Zoey Bonilla.[15]

3.   Bonilla was diagnosed with bipolar disorder.[16]

4.   She also had a history of drug abuse.[17]  For example, Bonilla was known to abuse Xanax and was addicted to it.[18]

**B.   Bonilla's Arrest and Incarceration in the Orange County Jail**

5.   Bonilla was arrested on Friday, February 24, 2017, by a City of Orange Police Department officer for possession of a controlled substance—namely, Xanax.[19]

6.   Bonilla was taken to the Orange County Jail and booked in at 10:44 a.m.[20]

7.   Upon arrival, the arresting officer completed an Intake Questionnaire and reported that Bonilla did not show any signs of alcohol ingestion, drug ingestion, or suicide.[21]

---

[12] *See* Ex. A, Zoey Bonilla Dep. at 19:13–14.  A highlighted excerpt of Zoey Bonilla's deposition transcript is attached as Exhibit A.
[13] *Id.* at 19:2–16.
[14] *Id.* at 19:21–20:2, 23:3–5, 25:12–25.
[15] *Id.* 20:17–21:7.
[16] *Id.* at 32:11–13.
[17] *Id.* at 49:15–50:25.
[18] *Id.*
[19] *See* Ex. B, Orange Police Department Incident Report.
[20] *See* Ex. C, Orange County Sheriff's Office Booking Sheet for Bonilla.
[21] *See* Ex. D, Intake Questionnaire.

8.      Thereafter, as part of the booking process, Officer Shafer performed a medical intake screening, which consists of asking the inmate medical and mental health questions and the booking officer making observations about the same.[22]  During the screening, Bonilla reported that she was bipolar and was taking Xanax, Trazadone, and Wellbutrin.[23]  Bonilla also reported that she had a history of drug abuse—specifically with Xanax and marijuana—but did not believe she would experience any withdrawal symptoms while incarcerated.[24]  Bonilla also stated that she did not intend to harm herself, was not suicidal, and had never attempted suicide in the past.[25]

9.      In addition to asking the questions on the screening form, Officer Shafer also observed Bonilla's demeanor and behavior during the course of the screening and booking process, as she was trained to do.[26]  Officer Shafer spoke to Bonilla in layman's terms about her well-being.[27]  Whenever Bonilla responded "yes" to any question on the screening form, Officer Shafer followed up with additional questions and thoroughly discussed each of Bonilla's responses with her.[28]

10.     After the screening, Officer Shafer kept Bonilla in the book-in area for about one (1) hour to observe her.[29]  Officer Shafer observed that Bonilla was agitated when she first arrived at the Orange County Jail, (which is common after a person is arrested) but then she became calm and positive over the course of the booking process.[30]  She did not observe Bonilla to be intoxicated at this time.[31]

---

[22]  *See* Ex. E, Screening Form for Suicide and Medical/Mental/Developmental Impairments.
[23]  *Id.*
[24]  *Id.*
[25]  *Id.*
[26]  *See* Ex. F, Jenifer Shafer Dep. at 23:14–24:4.  A highlighted excerpt of Officer Shafer's deposition transcript is attached as Exhibit F.
[27]  *Id.* at 37:8–13.
[28]  *Id.* at 38:8–16.
[29]  *Id.* at 23:14–24:4.
[30]  *Id.*
[31]  *Id.* at 36:18–19.

11.      **Based on the information Bonilla provided during the screening and her own observations of and interactions with Bonilla, Officer Shafer did not believe Bonilla would harm herself.**[32]

12.      In fact, Bonilla told Officer Shafer that she would not have any difficulties while in the Orange County Jail and that she would be leaving the next day.[33]

13.      After the booking process was complete, Officer Shafer placed Bonilla in the female holding cell.[34]  Bonilla was not placed on any level of suicide watch.  Bonilla was the only person in the holding cell throughout her incarceration.[35]

14.      Bonilla was observed by corrections officers at least every thirty (30) minutes (commonly referred to as "cell checks"), in excess of state law requirements.[36]  Corrections officers never observed any indication that Bonilla would harm herself.[37]

15.      During a visitation with her boyfriend later that day, Bonilla was making plans to contact a bondsman and be released from the Orange County Jail that day or the next.[38]

16.      Once the corrections officer completes the inmate's screening and booking process, the medical intake forms, including the screening form, are given to the shift supervisor for review, and then they are forwarded to the licensed vocational nurse ("LVN") on duty.[39]

17.      LVN Dickerson was on duty at the time of Bonilla's incarceration and reviewed

---

[32] *Id.* at 47:6–18.  "[S]he gave me no type of inclination that she would hurt herself."  *Id.* at 47:13–14.

[33] *Id.* at 38:13–16.

[34] *Id.* at 42:17–20.

[35]  *See* Ex. G, Madeline Lewis Dep. at 18:3–16.  A highlighted excerpt of Officer Lewis' deposition transcript is attached as Exhibit G; *see also* Ex. H, Jail Observation Logs.

[36]  *See* Ex. F, Jenifer Shafer Dep. at 42:20–43:1; Ex. H, Jail Observation Logs; Ex. G, Madeline Lewis Dep. at 30:14–21; *see also* 37 TEX. ADMIN. CODE § 275.1.  ("Facilities shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined.").

[37] *See id.*

[38] *See* Ex. I, Statement of Crystal Yocham.

[39]  *See* Ex. J, Tiffani Dickerson Dep. at 15:22–25.  A highlighted excerpt of LVN Dickerson's deposition transcript is attached as Exhibit J.

her medical intake forms.[40]  She did not have any personal interactions with Bonilla.[41]  Based on Bonilla's responses on the screening form, notifications to the magistrate judge and the local mental health authority (a.k.a., "MHMR") were required within seventy-two (72) hours.[42]  LVN Dickerson timely made those notifications and, in fact, did so within twelve (12) hours of Bonilla being booked in the Orange County Jail.[43]

18.    **After reviewing Bonilla's medical intake forms, LVN Dickerson did not believe Bonilla was at risk for self-harm.**[44]

19.    When Bonilla arrived at the Orange County Jail, she did not have any pill bottles labeled with prescription information or written prescriptions with her.[45]  LVN Dickerson had to verify that Bonilla had valid and current prescriptions for the medications she reported during her screening.[46]  LVN Dickerson began this process, but she was unable to verify the prescriptions before her shift ended at 6:00 p.m. that day.[47]  She also requested records from MHMR about Bonilla's medical and prescription history, but again did not receive a response prior to the end of her shift.[48]  She reported the information to the next LVN on duty, LVN Phillip Thompson ("LVN Thompson"), so he could complete the process.[49]

20.    When Officer Shafer's shift ended at 6:00 p.m., she was relieved by Officer Lewis. During shift change, Officer Shafer reported that there were no problems with Bonilla and that

---

[40] *Id.* at 15:10–12.
[41] *Id.* at 15:3–7.
[42] *Id.* at 26:8–25; *see also* TEX. CODE CRIM. PROC. art. 16.22.  The notification requirement was changed from seventy-two (72) hours to twelve (12) hours effective September 1, 2017, by the Sandra Bland Act.
[43] *See* Ex. J, Tiffani Dickerson Dep. at 26:18–22; 40:19–24; *see also* Ex. K, Magistrate and MHMR Notification.
[44] *See* Ex. J, Tiffani Dickerson Dep. at 25:16–20.
[45] *Id.* 32:3–15.
[46] *Id.*
[47] *Id.* at 23:15–24:5, 24:19–25:1.
[48] *Id.* at 46:23–47:2.
[49] *Id.* at 23:15–24:5, 24:19–25:1.

none of the female inmates exhibited risks for suicide.[50]

21.     Officer Lewis completed all cell checks during her shift within thirty (30)-minute intervals.[51] **At no time did Officer Lewis believe Bonilla intended to harm herself**.[52]

22.     At no time during her incarceration did Bonilla request any medical attention or medication—including the Xanax for which she claimed to have a prescription but was arrested for illegally possessing.  There is no indication that Bonilla ever made such requests: (1) during the booking process with Officer Shafer; (2) during any of the cell checks by Officer Shafer or Officer Lewis; (3) during the visitation with her boyfriend; (4) when she asked Officer Lewis about making a phone call; (5) later when she asked Officer Lewis for a cup and Officer Lewis brought one to her; or (6) later yet when she again asked Officer Lewis to use the phone and LVN Thompson was with her.[53]

## C.     Bonilla's Suicide

23.     About ten (10) hours after Bonilla's booking, Officer Lewis conducted a timely cell check at approximately 8:48 p.m. while escorting another female inmate to be placed in the female holding cell with Bonilla.[54]  At that time, Officer Lewis discovered that Bonilla attempted suicide by hanging herself,[55] by tying a sheet to the phone conduit in the cell.[56]

24.     Officer Lewis immediately called for assistance on the radio she was wearing.[57]

25.     Within twenty-nine (29) seconds,[58] Sergeant William Jowers ("Sergeant Jowers")

---

[50] Ex. G, Madeline Lewis Dep. at 13:12–25, 19:3–7.
[51] *See also* Ex. H, Jail Observation Logs.
[52] *See* Ex. G, Madeline Lewis Dep. at 30:14–21.
[53] *See* Ex. F, Jenifer Shafer Dep. at 34:10–13; Ex. G, Madeline Lewis Dep. at 30:25–31:3, 41:14–42:1; Ex. H, Jail Observation Logs; Ex. I, Statement of Crystal Yocham; Ex. L, Statements of Madeline Lewis.
[54] *See* Ex. G, Madeline Lewis Dep. at 26:10–20.
[55] *Id.*
[56] *See* Ex. M, William Jowers Dep. at 19:9–20.  A highlighted excerpt of Sergeant Jowers' deposition transcript is attached as Exhibit M.
[57] *See* Ex. G, Madeline Lewis Dep. at 26:24–27:21.
[58] *See* Ex. N, Jail Video.

and two (2) other corrections officers arrived at Bonilla's cell and began life-saving measures.[59] They cut down Bonilla, checked for a pulse, and began chest compressions.[60]  Sergeant Jowers also called over the radio for medical assistance and for dispatch to call an ambulance.[61]  Shortly thereafter, LVN Thompson arrived on scene to assist.[62]

26.     Within seven (7) minutes from when Bonilla was first discovered by Officer Lewis, emergency medical services ("EMS") arrived at her cell.[63]  EMS took over the life-saving efforts and were able to obtain a pulse before leaving the Orange County Jail with Bonilla.[64]

27.     Bonilla was taken to St. Elizabeth Hospital in Beaumont, Texas.[65]  About two (2) days later, on February 26, 2017, Bonilla was declared brain dead.[66]

28.     The autopsy determined that the cause of death was suicide by hanging.[67]  The toxicology report revealed no drugs in Bonilla's blood.[68]

29.     None of the Plaintiffs have personal knowledge about Bonilla's incarceration.[69]

**D.     The Texas Commission on Jail Standards' Investigation Found No Violations**

30.     As is typical when a custodial death occurs, the Texas Commission on Jail Standards ("TCJS") investigated Bonilla's incarceration and death.[70]  TCJS found no violations of minimum jail standards by the Orange County Sheriff's Office ("OCSO") or its employees.[71]

---

[59]  *See* Ex. M, William Jowers Dep. at 16:1–20.
[60]  *Id.* at 16:1–20.
[61]  *Id.* at 20:15–21:8.
[62]  *Id.*
[63]  *See* Ex. N, Jail Video.
[64]  *See* Ex. M, William Jowers Dep. at 25:2–7.
[65]  *See* Ex. O, Letter from Texas Commission on Jail Standards.
[66]  *Id.*
[67]  *See* Ex. P, Autopsy and Toxicology Reports.
[68]  *Id.*
[69]  *See* Ex. A, Zoey Bonilla Dep. at 70:8–15, 88:5–22; Ex. R, Justus Bonilla Dep. at 25:9–16.  A highlighted excerpt of Justus Bonilla's deposition transcript is attached as Ex. R.
[70]  *See* Ex. O, Letter from Texas Commission on Jail Standards.
[71]  *Id.*

- 10 -

**E.     All OCSO Corrections Officers and LVNs are Trained and Certified by the Texas Commission on Law Enforcement**

31.     All corrections officers and LVNs in the OCSO are required to complete the courses mandated by TCJS and the Texas Commission on Law Enforcement ("TCOLE") to obtain their TCOLE certification.[72]  They are also required to complete continuing education courses to keep their certifications active.[73]  For example, to keep an active jailer license, TCOLE requires corrections officers to take regular courses on mental health and suicide detection and prevention.[74]

32.     Officer Shafer has been a TCOLE-licensed jailer since April 22, 2015.[75]  Becoming a licensed jailer requires completion of a course on county corrections and field training from an accredited academy.[76]  Officer Shafer held a current and valid TCOLE jailer license at the time of Bonilla's incarceration.[77]

33.     LVN Dickerson has been a Texas-licensed LVN since 1998.[78]  She completes twenty (20) hours of continuing education every two (2) years for her LVN license.[79]  Her LVN license has never been suspended or revoked.[80]  Additionally, LVN Dickerson has been a TCOLE-licensed jailer since January 7, 2002.[81]  She currently holds a Master Jail Proficiency License (the highest level of license), which she received on December 19, 2016.[82]  She held a current and valid TCOLE jailer license at the time of Bonilla's incarceration.[83]

---

[72] *See* Ex. M, Keith Merritt Dep. at 26:11–23.
[73] *Id.*
[74] *See* Ex. S, Jenifer Shafer's TCOLE Personal Status Report; Ex. F, Jenifer Shafer Dep. at 10:6–13, 12:7–13:13; Ex. G, Madeline Lewis Dep. at 9:6–10:4.
[75] *See* Ex. S, Jenifer Shafer's TCOLE Personal Status Report.
[76] *See id.*; *see also* Ex. F, Jenifer Shafer Dep. at 9:17–10:4.
[77] *See* Ex. S, Jenifer Shafer's TCOLE Personal Status Report.
[78] *See* Ex. J, Tiffani Dickerson Dep. at 7:1–19.
[79] *Id.*
[80] *Id.*
[81] *See* Ex. T, Tiffani Dickerson's TCOLE Personal Status Report.
[82] *Id.*
[83] *Id.*

## F.        OCSO Policies

34.        The OCSO is guided by its Correctional Facility Operations Plan ("Operations Plan"), which is regularly updated.[84]   The Operations Plan in effect at the time of Bonilla's incarceration was approved by TCJS on April 15, 2015.[85]   The Operations Plan provides specific guidance on operational procedures, including the following relevant sections:

- **Chapter 1-Receiving:**

  - "The booking officer shall interview the inmate to complete the booking process. This process shall include the gathering of demographic and medical information . . . When behavior indicates a possible need for referral for mental illness/mental retardation at any point during incarceration, staff shall notify facility medical personnel.  Facility medical personnel are required to notify a magistrate . . . as soon as reasonably possible, but in no instance later than 72 hours[.]"[86]

  - "If an inmate who is being booked in must be placed in a holding cell, the corrections staff on duty shall make visual observation of the inmate in intervals not to exceed 30 minutes to ascertain his/her well being."[87]

  - "An Intake Screening Form (Screening Form for Suicide and Medical and Mental Impairments) shall be completed immediately upon entry into the facility and shall be completed prior to an inmate being placed in any cell."[88]

- **Chapter 3-Inmate Classification and Separation:**

  - "As part of the booking packet information, the booking officer will complete the medical and mental health screening instruments immediately for purposes of identifying any medical, mental health, or other special needs . . . Once completed, the medical and mental health screening instruments shall be forwarded to the shift supervisor for approval, then forwarded to on duty medical staff for approval."[89]

- **Chapter 5-Mental Disabilities/Suicide Prevention Plan:**

  - "Training:  (1) Upon initial employment and on an ongoing basis, staff shall be trained on the provisions for recognition of mental disability, mental illness and/or potentially suicidal tendencies, proper supervision of mentally disabled, mentally ill and/or potentially suicidal inmates, types of documentation to be maintained

---

[84]   *See* Ex. U, OCSO Correctional Facility Operations Plan, effective April 8, 2015.
[85]   *Id.*
[86]   *Id.* at 4.
[87]   *Id.*
[88]   *Id.*
[89]   *Id.* at 8–9.

such as inmates' behavior, appropriate supervision, housing, referrals, etc., and proper handling such as housing assignments, continuance of psychotropic medication, communication skills, use of restraints, etc.   (2) Annually each employee will receive 4 hours of in-service training provided by Sheriff's training division."[90]

o   "Screening:   (1)  Upon admission, all inmates will be screened by utilizing observation, previous arrest and incarceration history, information gathered from arresting or transporting officer, family or friends, and completion of the Texas Commission on Jail Standards "Intake Screening Form" (Screening Form for Suicide and Medical and Mental Impairments)."[91]

o   "Referrals:   (1)  When behavior indicates a possible need for referral for mental health services or when an inmate is exhibiting signs of mental illness/mental retardation at any point during incarceration, facility medical personnel are required to notify a magistrate . . . as soon as reasonably possible but in no instance in excess of 72 hours after determination."[92]

o   "Housing: . . . (2) . . . Inmates who have made an attempt at suicide, threatened suicide, are undergoing a psychotic episode or deemed a risk to themselves or others may be placed in a separation cell for close observation purposes under the authority of the Shift Supervisor.  Inmates placed in special housing for observation shall not be allowed shaving razors, writing implements or other property that may be used or adapted to cause bodily harm.  In extreme cases, when the inmate poses a threat to himself or to others, the shift supervisor may order all items, including clothing, be temporarily removed at which time the inmate shall be issued a suicide prevention safety smock.  This decision shall be made on a case by case basis.[93]

o   "Supervision:  (1) . . . Suicidal and psychotic inmates shall be observed under two (2) levels of supervision . . .
   (a)  Fifteen (15) minute observations:
        (1)  For high or moderate risk suicidal inmates who have verbalized a threat to harm themselves and/or who have recently acted in a manner as to harm themselves, or have a prior recent history of suicidal behavior, or are considered to be potentially suicidal. . . .
   (b)  Thirty (30) minute observations:
        (1)  For low risk suicidal inmates who have been released from fifteen (15) minute observations or those inmates who do not require fifteen (15) minute observations, manipulative inmates who threaten suicide, but who are not judged to be legitimately suicidal, and inmates who are too chemically impaired to participate in the screening process."[94]

---

[90] *Id.* at 14.
[91] *Id.*
[92] *Id.*
[93] *Id.* at 15.
[94] *Id.* at 16–17.

35.     Whenever there are any changes or updates to the Operations Plan, the OCSO provides training to jail personnel on those changes and updates.[95]  The OCSO also provides monthly training sessions to jail personnel on various topics and procedures.[96]

36.     The OCSO has a policy regarding the verification of inmate prescriptions.[97]  The Orange County Jail does not refuse any medications prescribed to an inmate.[98]  Prior to administering medications, jail medical personnel must take the medication or the medication information and confirm the prescription is current and valid and the dosage instructions.[99]

## V.     ARGUMENTS & AUTHORITIES

### A.     Summary Judgment is Proper Because There are No Genuine Issues of Material Fact

Summary judgment is appropriate when the moving party is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact and that the moving party is entitled to summary judgment as a matter of law.  FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986); *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999).  A material fact is one "that might affect the outcome of the suit under governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *Smith v. Brenoetty*, 158 F.3d 908, 911 (5th Cir. 1998).  There is no genuine issue of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for a non-moving party[.]"  *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 293–94 (5th Cir. 1987).  The Court must view the evidence and all factual inferences therefrom in the light most favorable to the nonmoving party.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

---

[95] *See* Ex. G, Madeline Lewis Dep. at 35:21–36:16.
[96] *See* Ex. F, Jenifer Shafer Dep. at 10:21–25.
[97] *See* Ex. V, Infirmary Doctor Protocol.
[98] *See id.*; Ex. W, Staff Training Agenda, dated February 2, 2017.
[99] *Id*; *see also* Ex. J, Tiffani Dickerson Dep. at 24:19–25:1.

Once the moving party meets its burden, the party opposing summary judgment must designate specific facts showing that there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Conclusory assertions, unsupported by specific facts presented in admissible evidence, are insufficient to defeat summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). Mere denials in pleadings are also insufficient to oppose summary judgment. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The party opposing summary judgment must respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence supports his or her claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

## B.   Plaintiffs Have Not Adequately Pled a Fourteenth Amendment Condition of Confinement Claim

Plaintiffs unsuccessfully attempt to plead both a condition of confinement claim and an episodic act or omission claim based on the Individual Defendants' failure to prevent Bonilla's suicide. Because Plaintiffs cannot prove a constitutional violation without first proving that a County employee acted in a manner to deprive Bonilla of her constitutional rights, Plaintiffs' claims fall squarely within an episodic act or omission case.

"A 'condition of confinement' case is a constitutional attack on 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996)). This category includes "such claims as 'where a detainee complains of the number of bunks in a cell or his television or mail privileges." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999) (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)). In contrast, "[i]n an 'episodic act or omission' case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that

permitted or caused the act or omission." *Scott*, 114 F.3d at 53.

Here, just as in *Olabisiomotosho*, *Flores*, and *Scott*, the actual harm of which Plaintiffs complain is the Individual Defendants' alleged failure to: (1) provide an adequate medical screening; (2) provide medication (specifically, Xanax); (3) adequately monitor; and (4) provide suicide-prevention bedding[100]—all alleged omissions perpetrated by an actor interposed between Bonilla and the County.  *See Olabisiomotosho*, 185 F.3d at 526 (ruling plaintiff did not raise a condition of confinement claim because her complaint turned on the officers' alleged failure to take better care of her, medically screen her, and secure treatment for her); *Flores*, 124 F.3d at 738 (holding plaintiffs did not successfully plead a condition of confinement claim in jail suicide matter despite their allegations that the county's training and staffing policies were inadequate); *Scott*, 114 F.3d at 53 (holding that, even though the plaintiff asserted under-staffing caused her injury, her actual complained-of harm was sexual assault, an episodic act).  Plaintiffs' attempt to fit their allegations in a condition of confinement claim by pointing to purported *de facto* County policies is ineffective because their claims are still unequivocally based on alleged omissions by the Individual Defendants.  *See Anderson v. Dallas Cty. Tex.*, 286 F. App'x 850, 859 (5th Cir. 2008) ("Because the plaintiffs cannot prove that [detainee who committed suicide] was subjected to cruel and unusual punishment without first proving that a state actor deprived him of his constitutional rights, the plaintiffs' case is an episodic-act-or-omission case.").

Furthermore, Plaintiffs cannot rely on *Montano v. Orange County*[101] to manufacture a condition of confinement claim because it is not analogous to this matter.[102]  Accordingly, Plaintiffs' claims are properly characterized as an episodic act or omission case, not a condition of confinement case.

---

[100] *See* Pls.' Second Am. Compl., ¶¶ 56–58.
[101] 842 F.3d 865 (5th Cir. 2016).
[102] 842 F.3d 865 (5th Cir. 2016).  *See* Mem. and Order 20–22.

C.   **Plaintiffs' Fourteenth Amendment Episodic Act or Omission Claims Against Officer Shafer and LVN Dickerson Fail as a Matter of Law Because They Were Not Deliberately Indifferent to Any Known, Substantial Risk of Suicide**

Plaintiffs claim that Officer Shafer and LVN Dickerson were deliberately indifferent to Bonilla's substantial risk of suicide by: (1) failing to provide an adequate medical screening; (2) failing to provide medication (specifically, Xanax); (3) failing to adequately monitor; and (4) failing to provide suicide-prevention bedding.  As set forth below, the evidence conclusively establishes that Officer Shafer and LVN Dickerson did not have any subjective knowledge of a substantial risk of suicide and did not act deliberately indifferent to any such risk.

Pretrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to adequate medical care and protection from harm during the length of their incarceration.  *See Thompson v. Upshur Cty., Tex.,* 245 F.3d 447, 457 (5th Cir. 2001); *Jacobs v. West Feliciana Sheriff's Dep't,* 228 F.3d 388, 393 (5th Cir. 2000); *Nunez v. Deviney,* No. 4:06–CV–0579–BE, 2007 WL 2059726, at *2 (N.D. Tex. July 17, 2007) (citing *Hare,* 74 F.3d at 639).

In *Hare,* the Fifth Circuit adopted the subjective deliberate indifference test for episodic act or omission claims.  *See Hare,* 74 F.3d at 647–50.  To be successful, Plaintiffs must establish: (1) that the defendant had subjective knowledge of a substantial risk of serious harm or suicide; and (2) that the defendant nevertheless disregarded the risk of suicide by responding to it with deliberate indifference.  *Id.* at 650.  In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Jones v. Throckmorton Cty., Tex.,* No. 1:02–CV–182–C, 2004 WL 419811, at *4 (N.D. Tex. March 8, 2004) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).  "An official's failure to alleviate a significant risk that he should have perceived but did not, while not commendable, does not rise to the level of deliberate indifference." *Nunez,* 2007 WL 2059726, at *2 (citing *Farmer,* 511 U.S. at 838).

Courts have noted that "[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). As such, a pretrial detainee's comments that his arrest will cause him to "lose everything" or that his "life will be over" or other comments that he is exasperated with living, do not demonstrate that jail personnel have actual knowledge of a substantial risk of suicide. *See, e.g., Branton v. City of Moss Point*, 261 F. App'x 659, 661 (5th Cir. 2008). Additionally, a pretrial detainee's affirmative answer on an intake screening, such as indicating that he recently lost a family member or was worried about other major problems, does not establish actual subjective knowledge of a suicide risk. *See, e.g., Whitt v. Stephens Cty.*, 236 F. App'x 900, 903 (5th Cir. 2007).

### 1. Neither Officer Shafer nor LVN Dickerson had subjective knowledge of substantial risk of suicide.

The evidence clearly establishes that neither Officer Shafer nor LVN Dickerson had subjective knowledge of a substantial risk that Bonilla may commit suicide.

#### a. Officer Shafer did not believe Bonilla would harm herself.

Officer Shafer worked 6:00 a.m. to 6:00 p.m. on February 24, 2017, and she was involved in conducting Bonilla's booking and medical screening, escorting Bonilla to visitation, and performing cell checks.[103] None of Officer Shafer's interactions with Bonilla or her observations of Bonilla's demeanor and behavior led her to believe Bonilla was at risk for suicide.[104]

First, the record shows that Officer Shafer conducted a thorough and adequate screening of Bonilla. She was trained and licensed to conduct screenings.[105] There is no requirement that the screenings be completed by a medical professional.[106] Officer Shafer used the screening form

---

[103] *See* Ex. F, Jenifer Shafer Dep. at 17:15–17, 40:19–43:1; Ex. E, Screening Form for Suicide and Medical/Mental/ Developmental Impairments; Ex. H, Jail Observation Logs.
[104] *See* Ex. F, Jenifer Shafer Dep. at 47:6–18.
[105] *See* Ex. S, Jenifer Shafer's TCOLE Personal Status Report; Ex. F, Jenifer Shafer Dep. at 10:6–13, 12:7–13:13.
[106] *See* 37 TEX. ADMIN. CODE § 273.5; TEX. CODE CRIM. PROC. art. 16.22.

developed by TCJS.[107]  She spoke to Bonilla in layman's terms about her well-being.[108]  Bonilla reported that she did not intend to harm herself, was not suicidal, and had never attempted suicide in the past.[109]  When Bonilla reported she was bipolar, had a history of abusing Xanax and marijuana, or responded affirmatively to any other question on the screening form, Officer Shafer asked follow-up questions on those issues and had in-depth discussions with Bonilla to further assess her current state.[110]  Bonilla was calm and positive and even made remarks about bonding out the next day.[111]  Officer Shafer continued to observe Bonilla over the next hour before placing her in the female holding cell.[112]  Officer Shafer also discussed Bonilla's demeanor and screening with her supervisor.[113]  Nothing during the booking and intake process gave Officer Shafer any indication that Bonilla would harm herself.[114]

Second, Officer Shafer did not have any subjective knowledge of a substantial risk that Bonilla may commit suicide if she did not receive Xanax.  Officer Shafer noted on the screening form that Bonilla reported taking Xanax and two (2) other medications and having a history of abusing Xanax—the drug she was arrested for illegally possessing—so that the LVN on duty could verify any prescriptions.[115]  Bonilla did not appear to be intoxicated after the booking process[116] and reported that she did not believe she would experience withdrawal symptoms.[117]  At no time during the booking process, Officer Shafer's cell checks, or the escort to visitation, did Bonilla ask Officer Shafer for Xanax.[118]

---

[107]  *Compare* Ex. E, Screening Form for Suicide and Medical/Mental/Development Impairments, *with* TEXAS COMMISSION ON JAIL STANDARDS, https://www.tcjs.state.tx.us/index.php?linkID=239 (last visited May 13, 2019).
[108]  *See* Ex. F, Jenifer Shafer Dep. at 37:8–13.
[109]  *See* Ex. E, Screening Form for Suicide and Medical/Mental/Development Impairments.
[110]  *See* Ex. F, Jenifer Shafer Dep. at 38:8–16.
[111]  *Id.*
[112]  *Id.* at 23:14–24:4.
[113]  *Id.* at 21:3–24:4.
[114]  *Id.* at 47:6–18.  "[S]he gave me no type of inclination that she would hurt herself."  *Id.* at 47:13–14.
[115]  *See* Ex. E, Screening Form for Suicide and Medical/Mental/Development Impairments.
[116]  *Id.*; Ex. F, Jenifer Shafer Dep. at 36:18–19.
[117]  *See* Ex. E, Screening Form for Suicide and Medical/Mental/Development Impairments.
[118]  *See* Ex. F, Jenifer Shafer Dep. at 34:10–13.

Bonilla was also properly monitored by Officer Shafer and other corrections officers every thirty (30) minutes—exceeding state law requirements.[119]  No cell check was missed.[120]

Lastly, and more importantly, Officer Shafer has testified that none of her interactions with Bonilla or her observations of Bonilla led her to believe Bonilla was at risk for suicide.[121]  Based on her training and experience, she determined that Bonilla was not a candidate for suicide watch, and, therefore, did not provide Bonilla with suicide-prevention bedding.

As shown above, Officer Shafer's conclusions were reasonable, based on her training and experience, and supported by Bonilla's demeanor, behavior, and responses during the screening and throughout her incarceration.  Accordingly, Officer Shafer did not have subjective knowledge of any substantial risk of suicide.[122]

### b.    LVN Dickerson did not believe Bonilla would harm herself.

LVN Dickerson was the LVN on duty when Bonilla was booked into the Orange County Jail,[123] however, she did not have any personal interactions with Bonilla.[124]  The record shows that, based on her limited involvement with respect to Bonilla's incarceration, LVN Dickerson had no reason to believe that Bonilla was at risk for suicide.

LVN Dickerson's involvement was limited to reviewing Bonilla's screening form and taking the necessary actions based on that information.  First, LVN Dickerson was required to send notifications to the magistrate judge and MHMR about the potential mental health issues raised on Bonilla's screening form, which she did timely.[125]  LVN Dickerson also initiated the process of verifying the three (3) prescriptions reported by Bonilla.  Prescription verification was especially

---

[119] *See* Ex. H, Jail Observation Logs; *see also* 37 TEX. ADMIN. CODE § 275.1.
[120] *Id.*
[121] *See* Ex. F, Jenifer Shafer Dep. at 47:6–18.
[122] *Id.*
[123] *See* Ex. J, Tiffani Dickerson Dep. at 24:4–5.
[124] *Id.* at 15:3–7.
[125] *Id.* at 26:18–22; 40:19–24; *see also* Ex. K, Magistrate and MHMR Notification.

important here because Bonilla was arrested for the illegal possession of Xanax—the very drug for which she claimed to have a prescription—and reported a history of abusing it.[126]  There is no required time period for verifying prescriptions,[127] but LVN Dickerson began the process as soon as reasonably possible.  However, she could not verify the prescriptions before the end of her shift at 6:00 p.m.[128]  LVN Dickerson also requested records from MHMR about Bonilla's medical history, but again did not receive a response prior to the end of her shift.[129]  She reported the information to the next shift's LVN so he could complete the process.[130]

LVN Dickerson did not have occasion to personally interact with Bonilla because, as the record confirms, Bonilla did not request any medication or medical treatment during her incarceration (although she had many opportunities with multiple corrections officers to do so) and the medical intake records did not indicate any immediate medical needs.[131]

Most importantly, LVN Dickerson testified that she did not believe Bonilla was at risk for suicide based on her review of the screening form and the other medical information she had at the time.[132]  Accordingly, LVN Dickerson did not have subjective knowledge of any substantial risk of suicide.

Based on the record here, it is clear that neither Officer Shafer nor LVN Dickerson had subjective knowledge of any risk that Bonilla may commit suicide, much less a substantial risk. Accordingly, Plaintiffs' Fourteenth Amendment claims against them fail as a matter of law.

---

[126]  *See* Ex. B, Orange Police Department Incident Report; Ex. E, Screening Form for Suicide and Medical/Mental/ Development Impairments.
[127]  *See generally*, Ex. U, OCSO Correctional Facility Operations Plan; 37 TEX. ADMIN. CODE §§ 273–275.
[128]  *See* Ex. J, Tiffani Dickerson Dep. at 23:15–24:5, 24:19–25:1.
[129]  *Id.* at 46:23–47:2.
[130]  *Id.* at 23:15–24:5, 24:19–25:1.
[131]  *See* Ex. F, Jenifer Shafer Dep. at 34:10–13; Ex. G, Madeline Lewis Dep. at 30:25–31:3, 41:14–42:1; Ex. H, Jail Observation Logs; Ex. I, Statement of Crystal Yocham; Ex. L, Statements of Madeline Lewis.
[132]  *See* Ex. J, Tiffani Dickerson Dep. at 25:16–20.

### 2.        Neither Officer Shafer nor LVN Dickerson acted with deliberate indifference.

As an initial matter, because Officer Shafer and LVN Dickerson were not subjectively aware of any substantial risk of suicide, they could not have been deliberately indifferent to any such risk.  *See, e.g., Brumfield v. Hollins*, 551 F.3d 322, 332 (5th Cir. 2008) (holding that a defendant cannot be deliberately indifferent if no known suicide danger).  Thus, Plaintiffs' Fourteenth Amendment claims against them are unsustainable for this reason as well.

Furthermore, even if Plaintiffs could raise a fact issue on subjective knowledge—which they cannot—"[d]eliberate indifference is an extremely high standard to meet." *Domino*, 239 F.3d at 756.  It must be proven that jail personnel "refused to treat [plaintiff], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.*  Put another way, Plaintiffs must establish more than mere negligence, and even more than gross negligence.  *See Hare*, 74 F.3d at 646.  A defendant's conduct must amount to an "intentional choice, not merely an unintentional oversight." *Calton v. Livingston,* No. H–09–2507, 2011 WL 2118700, at *16 (S.D. Tex. May 27, 2011).  Here, there is no evidence of deliberate indifference by Officer Shafer or LVN Dickerson. In fact, the record establishes the opposite.

#### a.        Officer Shafer did not act with deliberate indifference towards Bonilla.

The record demonstrates that Officer Shafer did not respond to any alleged, substantial risk of suicide with deliberate indifference.  First, the evidence shows that Officer Shafer properly conducted Bonilla's screening and thoroughly questioned her about her responses on the screening form.[133]  Based on this screening, an hour-long observation afterward, and a discussion with her supervisor, Officer Shafer placed Bonilla in the female holding cell where she was observed at

---

[133] *See* Ex. F, Jenifer Shafer Dep. at 38:8–16.

least every thirty (30) minutes.[134]  It is important to note that *even if* Bonilla was placed on suicide

watch, she still would have been observed in thirty (30)-minute intervals, in compliance with

OCSO policy and state law.[135]

There is simply no indication in the record that Officer Shafer intentionally screened

Bonilla incorrectly, ignored her, refused to monitor her, or otherwise intentionally acted with

deliberate indifference towards her.

> **b.    LVN Dickerson did not act with deliberate indifference towards Bonilla.**

The record also makes clear that LVN Dickerson acted appropriately.  First, LVN

Dickerson was not required to participate in Bonilla's screening.[136]  Her involvement with respect

to Bonilla was limited to reviewing Bonilla's screening form, timely making the required

notifications to the magistrate judge and MHMR,[137] beginning the necessary process of verifying

Bonilla's reported prescriptions within a reasonable time frame,[138] and requesting records from

MHMR about Bonilla's medical history.[139]  LVN Dickerson carried out these duties properly and

diligently.  Based on the medical information she had, and the lack of requests for medication or

medical treatment from Bonilla,[140] LVN Dickerson did not have occasion to personally interact

with Bonilla.  There is nothing in the record to support Plaintiffs' contention that LVN Dickerson

responded to any alleged, substantial risk of suicide with deliberate indifference.

Moreover, TCJS did not find that Officer Shafer, LVN Dickerson, or any jail personnel

---

[134]  *See* Ex. H, Jail Observation Logs.
[135]  *See* Ex. U, OCSO Correctional Facility Operations Plan, effective April 8, 2015, at 16–17; 37 TEX. ADMIN. CODE § 275.1.
[136]  There is no requirement in state law for a medical professional to conduct the inmate screening.  *See* 37 TEX. ADMIN. CODE § 273.5; TEX. CODE CRIM. PROC. art. 16.22.
[137]  *See* Ex. J, Tiffani Dickerson Dep. at 15:10–12, 26:8–25.
[138]  *Id.* at 23:15–24:5, 24:19–25:1.
[139]  *Id.* at 46:23–47:2.
[140]  *See* Ex. F, Jenifer Shafer Dep. at 34:10–13; Ex. G, Madeline Lewis Dep. at 30:25–31:3, 41:14–42:1; Ex. H, Jail Observation Logs; Ex. I, Statement of Crystal Yocham; Ex. L, Statements of Madeline Lewis.

violated the state minimum jail standards.[141]

The record here clearly establishes that Officer Shafer and LVN Dickerson acted reasonably and in compliance with their training, OCSO policies, and TCJS minimum jail standards. Therefore, even if Plaintiffs could raise a fact issue on the subjective knowledge prong of their Fourteenth Amendment claims—which they cannot—none of the actions of Officer Shafer or LVN Dickerson reach the extremely high standard of deliberate indifference. For this independent reason as well, Plaintiffs' Fourteenth Amendment claims fail as a matter of law.

**D.     Plaintiffs' Fourteenth Amendment Claims Against Officer Shafer and LVN Dickerson Also Fail Because They Are Entitled to Qualified Immunity**

In addition to failing as a matter of law on the merits, Plaintiffs' Fourteenth Amendment claims are also subject to dismissal because Officer Shafer and LVN Dickerson are entitled to qualified immunity as they did not violate any of Bonilla's clearly established rights and their conduct was objectively reasonable. "The doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Fountain v. City of Plano Police Dep't*, No. 4:12-cv-26, 2012 WL 7149510, at * 6 (E.D. Tex. Dec. 13, 2012) (citing *Wallace v. Cty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005)). In order to survive summary judgment, Plaintiffs must raise a fact question as to whether: (1) the defendant violated the Constitution under clearly-established law, and (2) the defendant's conduct was objectionably unreasonable under the circumstances. *See id.* (citing *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)).

**1.     Officer Shafer and LVN Dickerson did not violate any clearly established law.**

"[Q]ualified immunity shields government officials from civil damages liability unless the

---

[141] *See* Ex. O, Letter from Texas Commission on Jail Standards.

official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, --- U.S. ---, 135 S.Ct. 2042, 2044 (Jun. 1, 2015).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.*  As such, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

As shown above, Officer Shafer and LVN Dickerson did not violate Bonilla's Fourteenth Amendment rights.  Additionally, they did not violate any other clearly established right.  For example, the United States Supreme Court recently addressed the issue of whether pretrial detainees have a clearly established right to the proper implementation of adequate suicide prevention protocols, and it ruled they did not.  *Id.* at 135 S.Ct. at 2044.

The matter here is legally and factually similar to *Taylor*.  Like in *Taylor*, Plaintiffs allege that Officer Shafer and LVN Dickerson violated Bonilla's constitutional rights by failing to prevent her suicide and question the constitutionality of the OCSO's policies based on these individuals' implementation of them.[142]  In *Taylor*, a nurse used a screening form to ask the arrestee questions to assess whether he was suicidal.  *Id.* at 2043.  Although he was on psychiatric medication and disclosed a prior suicide attempt, he indicated he was not suicidal at the time of the screening.  *Id.*  Accordingly, the nurse did not put him on suicide watch.  *Id.*  The morning following his arrest, jail personnel first observed him acting normally.  *Id.*  However, later that morning, he committed suicide by hanging himself with a sheet.  *Id.*

In holding that there was no clearly established right to the proper implementation of adequate suicide prevention protocols, the *Taylor* Court specifically ruled:

> No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols.  No decision of this Court even discusses suicide screening or prevention protocols.  And "to the extent that a 'robust consensus of cases of persuasive authority'" in the Courts of Appeals "could itself

---

[142] *See* Pls.' Second Am. Compl., ¶¶ 56–67.

clearly establish the federal right respondent alleges," the weight of that authority at the time of Barkes' death suggested that such a right did *not* exist.  *See, e.g.*, *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2001) ("the right to medical care for serious medical needs does not encompass the right to be screened correctly for suicidal tendencies"); *Tittle v. Jefferson Cty. Comm'n,* 10 F.3d 1535, 1540 (11th Cir. 1994) (alleged "weaknesses in the [suicide] screening process, the training of deputies[,] and the supervision of prisoners" did not "amount to a showing of deliberate indifference toward the rights of prisoners"); *Burns v. Galveston,* 905 F.2d 100, 104 (5th Cir. 1990) (rejecting the proposition that "the right of detainees to adequate medical care includes an absolute right to psychological screening"); *Belcher v. Oliver,* 898 F.2d 32, 34–35 (4th Cir. 1990) ("The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies.").

*Id.* at 2044–45 (some internal citations omitted).  The *Taylor* Court went on to hold that the individual defendants were entitled to qualified immunity.  *Id.* at 2045.

Similarly, Fifth Circuit precedent provides that "jailers must take measures to prevent inmate suicides," but only "*once they know of the suicide risk.*"  *Calton*, 2011 WL 2118700, at *16 (emphasis added).  There is also no clearly-established right to any specific actions jail personnel must take once they know of a suicide risk.  *See Jacobs*, 228 F.3d at 394–95.

Thus, the case law establishes that Officer Shafer and LVN Dickerson did not violate any of Bonilla's clearly established constitutional rights.  They did not violate her Fourteenth Amendment rights and there is no right for the proper implementation of suicide prevention protocols or for specific actions to be taken once jail personnel have subjective knowledge of a substantial suicide risk.  Accordingly, they are entitled to qualified immunity.

## 2.   Even if there was a violation of clearly established law (which there was not), Officer Shafer and LVN Dickerson acted objectively reasonable.

Additionally, even if Bonilla had a clearly established right to the proper implementation of adequate suicide prevention protocols—which is denied and is contrary to Supreme Court precedent—Officer Shafer and LVN Dickerson would still be entitled to qualified immunity because their actions were objectively reasonable.

Qualified immunity analysis is two-fold: even if there was a violation of a clearly-

established right, the government official is still entitled to qualified immunity if his actions were objectively reasonable. *See Freeman v. Gore,* 483 F.3d 404, 410–11 (5th Cir. 2007). Whether conduct was objectively reasonable is a question of law for the Court, not a matter of fact for the jury. *Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir. 1999). The Court must ask whether it would be objectively reasonable for an officer to believe that his actions were constitutional. *See Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009). There is an important difference between the subjective deliberate indifference standard for Section 1983 liability, which is addressed during the first step of the qualified immunity analysis, and the objective reasonableness standard which is addressed during the second step. *See Thompson*, 245 F.3d at 459–460. "The defendant's acts are held to be objectively reasonable unless **all reasonable officials in the defendant's circumstances** would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Id.* at 457 (citing *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)) (emphasis added). At this stage, "a plaintiff must present evidence to raise a fact issue 'material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them.'" *Calton*, 2011 WL 2118700, at *15 (quoting *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993)). There is no evidence to support Plaintiffs' claims that Officer Shafer or LVN Dickerson acted objectively unreasonable. In fact, the record reveals that their conduct was reasonable and complied with OCSO policies and minimum jail standards.

First, Officer Shafer thoroughly and properly screened Bonilla and concluded, based on the totality of circumstances, that she did not exhibit a risk of suicide.[143] Officer Shafer was trained and licensed to conduct the screening,[144] she used the TCJS-compliant screening form,[145] she

---

[143] *See* Ex. F, Jenifer Shafer Dep. at 47:6–18.
[144] *See* Ex. S, Jenifer Shafer's TCOLE Personal Status Report; Ex. F, Jenifer Shafer Dep. at 10:6–13, 12:7–13:13.
[145] *See* Ex. E, Screening Form for Suicide and Medical/Mental/Developmental Impairments.

continued to observe Bonilla for about an hour after the screening,[146] and she elicited additional information from Bonilla about her responses.[147]  There is no information in the record to support the contention that all other reasonable officers would conclude that Bonilla was at risk for suicide based on her screening.  To the contrary, other corrections officers agreed that Bonilla did not pose a suicide risk.  Officer Shafer discussed Bonilla's screening with her supervisor, who agreed with placing Bonilla in the female holding cell.[148]  Additionally, after reviewing Bonilla's screening form, LVN Dickerson did not believe Bonilla demonstrated signs of suicide risk.[149]  Accordingly, Officer Shafer's actions were objectively reasonable.  *See, e.g.*, *Whitt*, 236 F. App'x at 902 (holding jailer entitled to qualified immunity where only evidence supporting finding of subjective knowledge of suicide risk was an answer on suicide screening form that inmate had recently lost a family member).

LVN Dickerson also acted objectively reasonable.  LVN Dickerson timely made the required notifications to the magistrate judge and MHMR and began the process of verifying Bonilla's reported medications and medical history.[150]  Because Bonilla did not request or require medication or treatment, there was no need for LVN Dickerson to personally interact with Bonilla.

Moreover, the TCJS investigation concluded that neither Officer Shafer, LVN Dickerson, nor any jail personnel violated minimum jail standards.[151]  Additionally, there is no evidence in the record that any different actions by them would have prevented Bonilla's suicide.

In light of the information known by Officer Shafer and LVN Dickerson, it cannot be said that all other reasonable jail personnel in these circumstances would have known that their conduct violated Bonilla's constitutional rights.  Their conduct was objectively reasonable, and, for this

---

[146] *See* Ex. F, Jenifer Shafer Dep. at 23:14–24:4.
[147] *Id*. at 38:8–16.
[148] *Id*. at 23:14–24:4.
[149] *See* Ex. J, Tiffani Dickerson Dep. at 25:16–20.
[150] *See* Ex. J, Tiffani Dickerson Dep. at 26:18–22, 40:19–24; *see also* Ex. K, Magistrate and MHMR Notification.
[151] *See* Ex. O, Letter from Texas Commission on Jail Standards.

independent reason as well, they are entitled to qualified immunity.

**E.      Plaintiffs' Claims Against the County Fail Because There Is No Evidence of an Official Policy or Custom That Was the "Moving Force" Behind Any Alleged Constitutional Violation or Failure to Train**

Plaintiffs assert the County is liable under *Monell*[152] because it had an official custom or policy that was the "moving force" behind alleged violations of Bonilla's constitutional rights.[153] As set forth below, this claim fails as a matter of law because Bonilla's constitutional rights were not violated, and the County did not have any custom or policy that was the moving force behind any alleged violation of Bonilla's rights.  In reality, the County, specifically the OCSO, has policies and practices in place to address mental health issues and suicide prevention and train jail personnel regarding the same.

Additionally, Plaintiffs appear to assert a failure to train claim against the County. Plaintiffs allege that jail personnel are not instructed on recognizing, communicating, and documenting mental health issues and differentiating between a mental health condition and drug or alcohol intoxication.[154]  As shown below, this claim is demonstrably false as Officer Shafer and LVN Dickerson were both TCOLE-licensed and trained.

**1.      There is no official policy or custom that was the "moving force" behind any alleged constitutional violation.**

First, Plaintiffs' *Monell* claim instantly fails because, as shown above, there was no violation of Bonilla's constitutional rights.  Further, even if Plaintiffs could prove a constitutional violation occurred—which they cannot—their *Monell* claim against the County would still fail because there is no official policy or custom that was the "moving force" behind such violation.

---

[152] *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978).

[153] To the extent Plaintiffs seek to impose liability on the County for the actions of its employees, a local governmental entity cannot be held liable for a constitutional tort simply because it employs a tortfeasor.  *Bd. of the Cty. Comm'rs of Bryan Cty., Okla. v. Brown,* 520 U.S. 397, 403 (1997).  As a matter of law, the County may be held liable under Section 1983 only for its own illegal acts, not pursuant to a theory of vicarious liability.  *Peterson v. City of Fort Worth, Tex.,* 588 F.3d. 838, 847 (5th Cir. 2002).

[154] Pls.' Second Am. Compl., ¶¶ 52–54.

To establish County liability under Section 1983, Plaintiffs must prove three (3) elements, in addition to the underlying claim of a constitutional violation: (1) an official policy or custom; (2) promulgated by the County's policymaker; (3) that was the "moving force" behind the violation of Bonilla's constitutional rights. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). These three (3) elements "are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id.* A county or municipality may not be held strictly liable for the acts of its non-policy-making employees under a *respondeat superior* theory. *Id.*

As an initial issue, the Plaintiffs' Second Amended Complaint does not clearly identify the alleged policy or custom at issue. Plaintiffs vaguely allege that:

> "The County of Orange had abundant knowledge, both actual and constructive, that the Individual Defendants, have consistently engaged in ongoing misconduct that includes an ongoing and constant deprivation of ROSA BONILLA's civil and constitutional rights under Color of State Law."[155]

Plaintiffs waited until filing their Response to the County Defendants' original Motion for Summary Judgment to identify, for the first time, the alleged customs they claim to be at issue. In their Response, they claim the County had *de facto* policies of: (1) relying solely on an inmate's oral response to the question about self-harm during booking to determine whether the inmate is at risk for suicide; and (2) waiting seventy-two (72) hours or more to provide prescription medications.[156]

Plaintiffs attempt to invent these alleged *de facto* polices by mischaracterizing deposition testimony. For example, regarding the booking process, Officer Shafer testified that corrections officers are trained on observing and recognizing cues in an inmate's emotions, behavior, and

---

[155] *Id.* at ¶ 76.
[156] Pls.' Opp'n to Defs.' Mot. for Summ. J., ¶¶ 106–107.

appearance that would require medical attention.[157]   Officer Shafer asked Bonilla numerous questions about medications, drugs, her mental health history, and her physical health.  She spoke to Bonilla in layman terms and asked Bonilla to explain and discuss her responses in depth.[158] Officer Shafer also testified that she discussed Bonilla's demeanor and responses with her supervisor prior to determining where to place Bonilla.[159]  An inmate's responses to the screening form questions is only one (1) of many factors that Officer Shafer, and corrections officers generally, consider when booking in an inmate and assessing medical, mental health, and suicide risks.

Plaintiffs also misrepresent Sheriff Merritt's deposition testimony in order to claim there is a *de facto* policy of waiting seventy-two (72) hours or more to provide prescription medications to inmates.  Sheriff Merritt's deposition testimony on this topic is extremely limited and is focused on the verification process, not distribution to inmates.  Sheriff Merritt testified only that a LVN performs the prescription verification and that there is no specified time limit within which the verification must be completed.[160]  Sheriff Merritt never stated that jail personnel customarily wait seventy-two (72) hours or more to disperse prescription medications.[161]  In fact, the term "seventy-two (72) hours" is nowhere to be found in his deposition.[162]

Furthermore, Plaintiffs ignore the documents in the record in order to craft the appearance of these alleged *de facto* policies.  The County Defendants have established that the County (through the OCSO) has written policies in place regarding the screening of inmates for medical and mental health issues, notification to the magistrate judge and MHMR, the regular supervision

---

[157]  *See* Ex. F, Jenifer Shafer Dep. at 12:7–13:7.
[158]  *Id*. at 21:5–12, 34:14–21, 37:1–13, 38:4–11.
[159]  *Id.* at 23:3–24:4.
[160]  *See* Ex. Q, Keith Merritt Dep. at 25:12–26:7.  A highlighted excerpt of Sheriff Merritt's deposition transcript is attached as Exhibit Q.
[161]  *See generally id.*
[162]  *See generally id.*

and observation of inmates, removal of items that may be used to cause bodily harm, training of

jail personnel on mental health issues and suicide prevention, and inmate prescription verification.

Specifically, the County's policies provide that:

- the Screening Form for Suicide and Medical and Mental Impairments shall be completed upon an inmate's entry into the Orange County Jail;[163]

- once the screening form is completed, it shall be forwarded to the shift supervisor and then medical personnel for approval;[164]

- if an inmate exhibits signs of mental illness, medical personnel are required to notify a magistrate judge in less than seventy-two (72) hours and may notify MHMR if warranted;[165]

- inmates in a holding cell must be observed every thirty (30) minutes;[166]

- inmates who are deemed a risk to themselves or others shall not have property that may be used or adapted to cause bodily harm;[167]

- inmates who are a low risk for suicide must be observed every thirty (30) minutes;[168]

- inmates who are a high risk for suicide (i.e., have verbalized a threat or taken actions of self-harm or have a recent history of suicidal behavior) must be observed every fifteen (15) minutes;[169] and

- inmate prescriptions will not be refused, but medical personnel must confirm the prescription is current and valid and the dosage instructions prior to administration.[170]

Except for the prescription verification policy, all the policies are promulgated in the OCSO's

Operations Plan, which was approved by TCJS.[171]   Jail personnel are trained on the Operations

---

[163] See Ex. U, OCSO Correctional Facility Operations Plan, effective April 8, 2015, at 4, 8–9, 14.
[164] Id. at 8–9.
[165] Id. at 14.
[166] Id. at 4.
[167] Id. at 15.
[168] Id. at 16–17.
[169] Id.  This policy exceeds state law requirements.  See 37 TEX. ADMIN. CODE § 275.1. ("Facilities shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined.").
[170] See Ex. V, Infirmary Doctor Protocol.
[171] Ex. U, OCSO Correctional Facility Operations Plan, effective April 8, 2015.

Plan and receive additional training whenever there are changes or updates to it.[172]  Consequently, the record irrefutably establishes that Plaintiffs cannot prove that the County failed to implement policies regarding the medical and mental health treatment of inmates or that any such policies are constitutionally inadequate.

Furthermore, there is nothing in the record to indicate that, at the time of Bonilla's incarceration, there was a pattern of conduct or prior incidents that would lead Sheriff Merritt to believe that OCSO policies and practices were inadequate so as to pose a risk to inmates or interfere with their medical and mental health services or that jail personnel were acting contrary to OCSO policies.[173]  In fact, the record establishes the opposite; Officer Shafer, LVN Dickerson, and all the jail personnel acted in accordance with the OCSO's TCJS-approved Operations Plan:

- Officer Shafer thoroughly screened Bonilla upon intake and observed her for about an hour before placing her in a holding cell;[174]

- LVN Dickerson reviewed Bonilla's screening form and made the required notifications to the magistrate judge and MHMR;[175]

- LVN Dickerson began the process of verifying Bonilla's reported prescriptions within a reasonable time;[176]

- Bonilla was observed every thirty (30) minutes by corrections officers, including Officer Shafer;[177] and

- Officer Lewis immediately called for assistance upon discovering Bonilla's suicide attempt, and corrections officers quickly responded and were providing life-saving measures within twenty-nine (29) seconds.[178]

---

[172]  *See, e.g.*, Ex. G Madeline Lewis Dep. at 35:21–36:16.

[173]  Plaintiffs spend much time discussing the *Montano v. Orange Cty.*, 842 F.3d 865 (5th Cir. 2016) decision in their Second Amended Complaint, but that matter is legally and factually inapposite to the incident here.  *See* Pls.' Second Am. Compl., ¶¶ 85–96.  Unlike Bonilla, Montano was incarcerated in the Orange County Jail's observation cell in the infirmary for over four (4) days and died from acute renal failure.  Montano did not commit suicide.  At issue in *Montano* was the County's policies and practices regarding detoxification, not suicide prevention.  More importantly, this Court has already found that *Montano* was distinguishable from and inapplicable to this matter.  *See* Mem. and Order 20–22.

[174]  *See* Ex. F, Jenifer Shafer Dep. at 23:14–24:4, 38:8–16.

[175]  *See* Ex. J, Tiffani Dickerson Dep. at 25:16–20, 26:18–22, 40:19–24; *see also* Ex. K, Magistrate and MHMR Notification.

[176]  *See* Ex. J, Tiffani Dickerson Dep. at 23:15–24:5, 24:19–25:1.

[177]  *See* Ex. H, Jail Observation Log.

[178]  *See* Ex. N, Jail Video.

Furthermore, the TCJS investigation found that there were no violations by the Orange County Jail or its employees.[179]

Accordingly, because there is no official policy or custom promulgated by an official policymaker that was the "moving force" behind any alleged violation, the Plaintiffs cannot prove the third element of their *Monell* claim, and it fails as a matter of law.

### 2. The Orange County Jail personnel are properly trained and licensed.

Plaintiffs' claim that the County (through Sheriff Merritt) failed to train jail personnel on recognizing, communicating, and documenting inmate mental health issues and suicide risks is factually baseless. To establish a claim of failure to train under Section 1983, Plaintiffs must show that: (1) the supervisor either failed to train the subordinate; (2) a causal link exists between the failure to train and the violation of the plaintiff's rights; and (3) the failure to train amounts to deliberate indifference. *Estate of Davis ex. Rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Deliberate indifference can only be established by proof that a municipal actor disregarded a known or obvious consequence of his action. *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011). County policymakers may be deemed deliberately indifferent if the policymakers choose to retain a training program that they are on actual or constructive notice that a particular omission in that program causes jail personnel to violate citizens' constitutional rights. *Id.* "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

There is no evidence here that Sheriff Merritt was actually or constructively aware that the OCSO's training with respect to inmate mental health issues and suicide prevention was inadequate as to pose a risk to inmates. First, the OCSO has a written policy on the required

---

[179] *See* Ex. O, Letter from Texas Commission on Jail Standards.

training of jail personnel on mental health issues and suicide prevention that is approved by TCJS.[180]

Second, the record establishes that Officer Shafer and LVN Dickerson were trained and properly licensed at the time of Bonilla's suicide.  Officer Shafer has been a TCOLE-licensed jailer since April 22, 2015.[181]  LVN Dickerson has been a Texas-licensed LVN since 1998[182] and a TCOLE-licensed jailer since January 7, 2002.[183]  She currently holds a Master Jail Proficiency License (the highest level of license), which she received on December 19, 2016.[184]  They are all required to complete continuing education courses to keep their TCOLE licenses active, including regular courses on mental health and suicide detection and prevention.[185]  Based on this evidence, the Plaintiffs' failure to train claim fails and is subject to summary judgment.

## VI.  PRAYER

For the foregoing reasons, all of Plaintiffs' claims against the County Defendants fail as a matter of law and summary judgment is appropriate.  Defendants ORANGE COUNTY, TEXAS, TIFFANI DICKERSON, and JENIFER SHAFER pray that their First Amended Motion for Summary Judgment be granted, that Plaintiffs' claims be dismissed with prejudice, that all costs be borne by the Party incurring same, and for such other and further relief to which they may be justly entitled.

---

[180] *See* Ex. U, OCSO Correctional Facility Operations Plan, effective April 8, 2015; *see also* Ex. Q, Keith Merritt Dep. at 26:11–23.
[181] *See* Ex. S, Jenifer Shafer's TCOLE Personal Status Report.
[182] *See* Ex. J, Tiffani Dickerson Dep. at 7:1–19.
[183] *See* Ex. T, Tiffani Dickerson's TCOLE Personal Status Report.
[184] *Id.*
[185] *See* Ex. F, Jenifer Shafer Dep. at 10:6–13, 12:7–13:13; Ex. G, Madeline Lewis Dep. at 9:6–10:4.

Respectfully submitted,

_Larry J. Simmons_
_____
**Larry J. Simmons – Attorney-in-Charge**
State Bar No. 00789628
Federal I.D. No. 18830
**Carmen Jo Rejda-Ponce – Of Counsel**
State Bar No. 24079149
Federal I.D. No. 1366666
**GERMER PLLC**
America Tower
2929 Allen Parkway, Suite 2900
Houston, Texas 77019
(713) 650-1313 – Telephone
(713) 739-7420 – Facsimile

**COUNSEL FOR THE COUNTY DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of July 2019, a true and correct copy of the foregoing document was forwarded to all known counsel of record pursuant to the Federal Rules of Civil Procedure.

_Larry J. Simmons_
_____
**Larry J. Simmons**